UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | Nos. | 12 CR 723 |
| v. | ) | | 13 CR 703 |
| | ) | | 15 CR 487 |
| ADEL DAOUD | ) | | |
| | ) | Judge Sharon Johnson Coleman | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

# TABLE OF CONTENTS

Table of Authorities .................................................................................................iii

I.  Advisory Guideline Range ...................................................................... 3

II. Application of § 3553(a) Factors ........................................................... 3

   A.  Nature and circumstances of the offenses ...................................... 4

   B.  The Defendant was Not Entrapped ................................................ 7

      1.  Defendant was predisposed to commit a terrorist attack...................... 8

      2.  The government did not induce defendant to attempt a terrorist attack. ................................................................................ 11

      3.  The defendant decided for himself that killing innocent civilians was justified, despite attempts by the OCEs to talk defendant out of this view. ................................................................................ 23

      4.  Defendant Recruited His Friends to Jihad ............................................ 29

      5.  Defendant solicited the murder of the UC without any inducement by the government, was predisposed to do so, and was not coerced by the CHS. ........................................................................................ 31

      6.  Defendant was not legally insane when he attempted to murder his fellow inmate; instead, he acted consistently with his long-held and previously stated beliefs......................................................................... 35

      7.  Imperfect entrapment is not a mitigating factor in this case.............. 37

   C.  History and Characteristics of the Defendant............................... 38

      1.  Defendant's Background.......................................................................... 38

      2.  Mental Health ......................................................................................... 39

   D.  A 40 Year Sentence Is Necessary Based upon the Crimes Committed..... 46

      1.  The Seriousness of the Offenses ............................................................ 46

      2.  To Promote Respect for the Law............................................................ 47

      3.  Protection of the Public and Deterrence ............................................... 47

E.    The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants ................................................................ 49

    1.    The Cactus bombing .......................................................... 49

    2.    Soliciting the murder of the UC ........................................ 53

    3.    Stabbing of cellmate ......................................................... 54

III.    Conclusion ................................................................................. 55

TABLE OF AUTHORITIES

CASES

*Gall v. United States*, 552 U.S. 38 (2007) ....................................................... 4

*United States v. Bala*, 236 F. 3d 87 (2nd Cir. 2000) ..................................... 37

*United State v. Crosby*, 139 F.3d 893 (4th Cir. 1998) .................................. 53

*United States v. Caira*, 737 F.3d 455 (7th Cir. 2013) .................................. 53

*United States v. Dick*, 194 F.3d 1314 (6th Cir. 1999) .................................. 53

*United States v. Dickey*, 924 F.2d 836 (9th Cir. 1991) .................................. 37

*United States v. Hasan Edmonds*, 15 CR 149- (N.D. Ill. J. John Z. Lee, September 20, 2016) ..................................................................................................... 41

*United States v. Finton*, 3:10 CR 30215-DRH (S.D. Ill. 2010) ................................... 52

*United States v. Garza-Juarez*, 992 F.2d 896 (9th Cir. 1993) .................................... 37

*United States v. Gustin*, 642 F.3d 573 (7th Cir. 2011) ................................. 54

*United States v. Hassoun*, 10 CR 773- (N.D. Ill. 2010, J. Gettleman) .................. 2, 49

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) ................................. 47, 49

*United States v. Khalifi*, 1:12 CR 37-JCC (E.D. Va. 2012) ....................................... 51

*United States v. Lutchman*, 910 F.3d 33 (2nd Cir. 2018) .................................... 45, 46

*United States v. Mayfield*, 771 F.3d 417 (7th Cir. 2014) .................................... passim

*United States v. McClelland*, 72 F.3d 717 (9th Cir. 1995) ................................. 37, 38

*United States v. Meskini*, 319 F.3d 88 (2d Cir.2003) .................................. 47

*United States v. Mohamud*, 843 F.3d 420 (9th Cir. 2016) ........................................ 52

*United States v. Nafis*, 1:12 CR 720 (E.D.N.Y. 2012) ............................................ 2, 49

*United States v. Osmakac*, 868 F.3d 937 (11th Cir. 2017) ..................................... 3, 51

*United States v. Rita*, 551 U.S. 338 (2007) ............................................................ 3, 4

*United States v. Shareef*, 2011 WOL 183876 (N.D. Ill. May 13, 2011, J. Coar) .... 3, 50

*United States v. Smadi*, 3:09 CR 294-M (N.D. Tex. Oct.. 28, 2010)........................... 50

*United States v. Sokoya*, 2007 Wl 4198244*6 (N.D.IL 2007) ................................ 37, 38

*United States v. Tounisi*, 900 F. 3d 982 (7th Cir. 2018).............................................. 44

### STATUTES

18 U.S.C. § 113(a)(1) ................................................................................................ 54

18 U.S.C. § 1114 ....................................................................................................... 53

18 U.S.C. § 3553(a) ........................................................................................... 1, 3, 38

18 U.S.C. § 3553(a)(1) ................................................................................................ 4

18 U.S.C. § 3553(a)(2) ................................................................................................ 4

18 U.S.C. § 3553(a)(6) ........................................................................................... 4, 49

### RULES

U.S.S.G. § 5K2.12 ................................................................................................... 45

U.S.S.G. § 5K2.13 ................................................................................................... 45

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby respectfully submits its Sentencing Memorandum to inform the Court of the government's arguments in support of a substantial but warranted sentence as well as to respond to mitigating arguments that will likely be presented by the defense to include imperfect entrapment and the defendant's mental health. The government will address the defense's entrapment and mental health arguments within its 18 U.S.C. § 3553(a) arguments.[1]

On September 14, 2012, the defendant attempted to detonate a 1,000-pound car bomb that he believed was going to kill hundreds of people who were enjoying a warm evening at the Cactus Bar and Grill. Prior to that evening the defendant had been preaching for violent jihad. The defendant voraciously consumed jihadist material and believed that, in the name of God, he must defend Muslims and Muslim lands from the "kuffars" living in America and from the American government. The government provided an opportunity to see if he was serious, which the defendant jumped at. As the defendant told the undercover agent, "[N]ow I'm doing what I've been preaching." Gov. Ex. 9-13 Transcript at p. 60.[2]

---

[1] Contemporaneous with the filing of this memorandum, the government will provide the Court with electronic copies of the exhibits that will be introduced during the sentencing hearing, which includes exhibits cited in this memorandum. For the Court's reference, the government will file its Exhibit List as Exhibit 1 to this memorandum.

[2] Government's Exhibits "[date] Transcript" refer to transcripts of recordings involving the defendant and the FBI undercover agent.

The defendant was not done. After he was incarcerated for his attempted mass murder, he was housed with a gang member. The defendant solicited his cellmate to have his fellow gang members kill the undercover agent whom the defendant believed was an Islamic hypocrite and a spy that needed to die.

The defendant was still not done. Several years later, while incarcerated, the defendant attempted to murder an inmate at the MCC who had drawn a picture of the Prophet Mohammad. The defendant found the picture to be insulting to Islam and felt obligated to kill the inmate.

There is an obvious string that runs through these separate cases – the defendant's belief that his religion requires violent action against those who do not conform to his beliefs. The defendant's actions and belief system, while an anathema to any law-abiding person, were based on material distributed by a small, radical sect of Islam and a hatred for U.S. foreign policy.

The defendant's statutory maximum is life imprisonment. The defendant's sentencing guidelines call for life imprisonment. The government is recommending a sentence of 40 years imprisonment with lifetime supervised release. A sentence of this length will reflect the seriousness of the offenses, is consistent with sentences issued in similar cases and, most importantly, will serve to protect the public, while considering that upon release he will be at an age where recidivism is less likely.

Prior courts, addressing conduct similar to defendant's first offense, have imposed sentences between 23 and 40 years, to include *United States v. Hassoun*, 1:10-CR-00773 (N.D. Ill. 2010, Gettleman, J. presiding) (23 years); *United States v.*

*Shareef*, 2011 WOL 183876, (N.D. Ill. May 13, 2011, Coar, J., presiding) (35 years); *United States v. Mohamud*, 843 F.3d 420 (9th Cir. 2016) (30 years); and *United States v. Osmakac*, 868 F.3d 937 (11th Cir. 2017) (40 years). These cases, and others addressed later in this memorandum, involved young defendants, some of whom claimed to have mental health issues and attempted to detonate inert explosive devices provided by an undercover FBI agent. When the other two very serious violent offenses are considered, as they should be, coupled with a Sentencing Guideline range of life, a sentence of 40 years is more than reasonable.

As the Court is aware, the defendant has entered an *Alford* plea to the three separate criminal cases. Defendant has not admitted any wrongdoing and continues to maintain his innocence. The facts set forth in the government's previously-filed factual basis, which the government incorporates by reference into this sentencing memorandum, as well as the additional facts set forth in this memorandum and those presented at the sentencing hearing, lay the foundation for the government's 18 U.S.C. § 3553(a) arguments as well as refute the defense's continued insistence that the defendant's conduct was due to imperfect entrapment.

## I. ADVISORY GUIDELINE RANGE

The government agrees with the PSR that the total offense level is 43, the defendant's Criminal History Category is VI, and the resulting guideline range is life.

## II. APPLICATION OF § 3553(A) FACTORS

The sentencing guidelines are advisory and simply the first of the statutory factors this Court must consider when imposing a sentence. *See* 18 U.S.C. § 3553(a)(4); *United States v. Rita*, 551 U.S. 338, 347-48 (2007). They serve as "the

starting point and the initial benchmark" in every sentencing proceeding, *Gall v. United States*, 552 U.S. 38, 49 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita*, 551 U.S. at 350. The remaining factors this Court should consider include the defendant's history and characteristics, the nature and seriousness of the offense, the need to provide just punishment and adequate deterrence, the need to promote respect for the law, and the need to protect the public from further crimes committed by the defendant. 18 U.S.C. § 3553(a)(1)-(2). They also include "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6); *see also Rita*, 551 U.S. at 347-48 (enumerating the statutory sentencing factors); *Gall*, 552 U.S. at 50 n.6 (same).

### A.    Nature and circumstances of the offenses

The offenses, individually or combined, were horrific. Had the defendant fulfilled his goal, he would have murdered hundreds of people, severely injured scores more and caused millions of dollars in property damage. After being arrested and detained for his first offense, the defendant attempted to murder an FBI agent because he was a "FBI agent, American, spy, and kaffer" Gov. Ex. S476-2 p. 3 who he believed he "should have actually killed" earlier. Gov. Ex. S405-1 p.1.[3] Several years later, while still incarcerated, the defendant tried to kill a fellow inmate because the inmate had drawn a picture of the Prophet Muhammad.

---

[3] Government Exhibits "S[number]" corresponds to the transcripts of the prison recordings involving the defendant and his cellmate.

The defendant's conduct resulted from a deeply held religious belief that he "was born to kill somebody in the way of God;" "I kill for God." Gov. Ex. S219-1 p. 1; Gov. Ex. S406-2 p. 4. But not only did he want to kill in the name of religion, he also wanted the first offense be an act of terrorism committed on behalf of Al Qaeda in order to strike fear in the hearts of the American people. During a September 5, 2012, meeting with the undercover agent (UC), the defendant expressed concern that the world would not know the bombing was a "Muslim terrorist attack." Gov. Ex. 9-5 Transcript at p. 98. The defendant asked the UC to instruct his sheikh to contact Al Qaeda and have them claim responsibility for the attack. He wanted Al Qaeda to announce that "if you don't stop killing us and putting in prisoners, doing all these things…. more attacks will come." Gov. Ex. 9-5 Transcript at p. 101. And, "It's gonna get much worse. Hundred, five hundred people. You think that's a lot? Yeah. Wait 'til the next thing we're gonna do. And it's not gonna be in Chicago. It might be in some other place." Gov. Ex. 9-5 Transcript at p. 103. Had the defendant been successful, not only would he have caused untold physical and psychological damage but his actions would have dishonored his religion.

The defendant had been thinking about and preparing himself for jihad long before he engaged with the two online covert employees (OCE One and OCE Two) or the UC. He had been insatiably consuming material on jihad to include Inspire magazine, an Al Qaeda production specifically designed to encourage and assist individuals to commit violent acts in the jihad. He had also been consuming lectures by well-known terrorists, including Osama Bin Laden and Anwar al Alwaki, whose

presentations were designed to radicalize and inspire Muslims to kill Americans. He also attempted to recruit his friends to become terrorists and join him in his quest.

The defendant, during the course of the planning the attack, told the UC that his friend believed the UC to be a spy. The defendant told the UC that spies must die. After the defendant was arrested, his belief that the UC must die was cemented. The defendant saw an opportunity to fulfill his belief about spies when, while detained after his arrest, he was housed with a high ranking gang member. The defendant recognized that this cellmate had influence and may be able to have the UC killed by one of his cellmate's fellow gang members. The defendant offered the cellmate $20,000 to kill the UC and provided the cellmate with the UC's phone number in order to assist the UC's associates in locating the UC. The cellmate notified law enforcement and began cooperating as a Confidential Human Source (CHS). The prison moved the two into a new cell that, unbeknownst to the defendant, contained a hidden recording device. While in this new cell, the defendant told the CHS that he wanted the UC to be killed in a manner that would insure that the UC was dead. The CHS showed the defendant a picture of the UC in order for the defendant to positively identify the UC as the correct target. The CHS then instructed the defendant to make a phone call to a purported gang member and provide the gang member with a code sentence ("How is Uncle Mike?") that would trigger the hit on the UC. The defendant followed the instructions without hesitation. When told the UC was killed, the defendant expressed his relief.

The defendant's penchant for killing in the name of his religious beliefs was not done. From 2011 through his arrest in September 2012, the defendant had consumed material that advocated for killing anyone who defamed Islam. The defendant made several statements to friends and associates in support of this edict. Fast forward several years when the defendant was housed at the MCC. In 2015 a fellow inmate drew a picture of the Prophet to which the defendant took offense. The defendant attacked the inmate but was stopped before he could do more harm. Several months later, after the inmate and the defendant appeared to become friends, the defendant again attacked the inmate. This time the defendant had made two shivs out of toothbrushes, which the defendant used to viciously stab the inmate in the head while the inmate was sleeping. After he was pulled off the inmate, the defendant had the presence of mind to flush the weapons down the toilet.

The defendant has ignored the substantial volume of evidence establishing his guilt beyond a reasonable doubt and has instead implicitly argued that he was entrapped, or at least, that the government engaged in imperfect entrapment. *See generally, Defense Version of the Facts*, pg. 10 and 12. Neither is the case.

**B.    The Defendant was Not Entrapped**

"Entrapment is a defense to criminal liability when the defendant was not predisposed to commit the charged crime before the intervention of the government's agents and the government's conduct induced him to commit it." *United States v. Mayfield*, 771 F.3d 417, 420 (7th Cir. 2014).

This Circuit has rejected the notion that inducement is any government solicitation of the crime. *Mayfield*, 771 at 417. Instead, inducement requires more.

7

> We hold that inducement means more than mere government solicitation of the crime; the fact that government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement. Instead, inducement means government solicitation of the crime plus some other government conduct that creates a risk that a person who would not commit the crime is left to his own devices will do so in response to the government's efforts. The 'other conduct' may be repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship, or any other conduct by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts.

*Mayfield*, 711 at 434 - 35.

"Predisposition thus refers to the likelihood that the defendant would have committed the crime without the government's intervention, or actively wanted to but hadn't yet found the means." *Mayfield,* 771 at 436. Predisposition is measured prior to the government's interaction with the defendant but continues throughout the interaction. "[T]he defendant's response to the government's offer may be important evidence of his predisposition." *Id*. at 437.

### 1.    Defendant was predisposed to commit a terrorist attack.

In addition to the examples of predisposition set forth in the government's factual basis which will not be repeated here but which the government will present during the sentencing hearing, there is an abundance of additional evidence demonstrating the defendant's desire to engage in violent jihad in the name of Islam and to kill people whom he believes oppress Muslims, with a particular focus on killing Americans.

The defendant viewed America as the enemy and oppressor of Islam, and he believed it was ok to kill the enemy. On March 29, 2012, he posted on YouTube, "they help KILL Muslims?! What the hell!! Yea man if they worship graves and kill Muslims are you are definitely allowed to kill them." Gov. Ex. YouTube Posting 1 p. 10.[4] On April 23, 2012, he messaged on YouTube, "If Allah decided to destroy this whole country EVEN IF I AM IN IT i wouldn't question it. In fact, if i was able to i would THANK HIM. These people have made everything halal except killing and some rape and they support the killing of Muslims." Gov. Ex. YouTube 14 p.7.[5] On April 24, 2012, he posted on YouTube, "blaming the world for our problems? no we're blaming the Muslims for not practicing Islam properly and we're blaming AMERICA for killing people in our countries!" Gov. Ex. YouTube Posting 1 p. 6.

On May 22, 2012, he continued to express his hatred for America when he posted on YouTube, "Don't celebrate the death of bin laden. because now that he's dead A MILLION NEW OSAMA BIN LADENS ARE BORN. And now that they killed Anwar Al awlaki A MILLION NEW ANWARS ARE BORN!!! BE AFRAID BECAUSE AMERICA'S END IS NEAR INSHA'ALLAH." Gov. Ex. YouTube Posting 1 p. 1.

During this same time period, he sought out material that supported his violent beliefs, such as terrorist recruitment videos, songs about jihad and Inspire magazine. For example, on March 31, 2012, he viewed videos on YouTube titled

---

[4] Government's Exhibits labeled "YouTube Posting" are public comments posted to YouTube videos.

[5] Government's Exhibits labeled "YouTube [number]" are private communications with other individuals through YouTube messaging.

9

"urgent message from Abu Mansour al-Amriki," "Abu Mansour al-Amriki leading a Battle and Rapping (Ambush at Bardale)," "American terrorist abu mansoor."[6] On April 21, 2012, he viewed "NEVER EVER TRUST THE LEADERS OF THE KUFFAR – Anwar Al-Awlaaki (rahimahullah)." Gov. Ex. Web History p.1.[7]

He also viewed jihadi nasheeds (songs), which generally encouraged people to commit jihad. For example, on April 25, 2012, he searched YouTube for "al qaeda nasheed" and on May 4, 2012, he viewed "jihad nasheed ya shaid," and "jihad nasheed ana ana." Gov. Ex. Web History p.4-6. The defendant found inspiration from the nasheeds he heard. For example, on April 30, 2012, in response to a YouTube posting titled "Amazing Mujahideen Training (Martial Arts)," he posted, "MAN THAT SHABB NASHEED IS CRAZYY!!!!!!!!!!!!!!! THAT'S REAL ENCOURAGMENT." Gov. Ex. YouTube 14 p.4.

He sought out and downloaded Al Qaeda's Inspire magazine. For example on May 9, 2012, he downloaded "Inspire magazine issue 1" and "full text of 'Inspire.'" Gov. Ex. Web History p.7-8. The next day, he viewed an article entitled, "Al-Qaeda magazine teaches how to kill Americans – Ansar Al-Mujahideen." Gov. Ex. Web History p.9.

In case there was any question about defendant's definition of jihad, on May 1, 2012, he defined it when he posted on YouTube, "jihad is referred to in the Quran and

---

[6] Abu Mansour al-Amriki was an American who became a high ranking member of the foreign terrorist organization Al Shabaab. Amriki made recruitment videos for the foreign terrorist organization al Shabaab that were distributed on the internet.

[7] Government Exhibits labeled "Web History" refer to defendant's internet history.

sunnah as fighting. so when i say jihad or most of the time of Quran and sunnah say jihad it means fighting. but you have to fight the disbelievers with your hearts, tongues, and swords. Fight them with your words and by your swords." Gov. Ex. YouTube Posting 1 p.4.

As his numerous online postings before ever encountering a government agent confirm, defendant had a strong predisposition to commit violent jihad.

### 2. The government did not induce defendant to attempt a terrorist attack.

The government did not induce the defendant to try to kill hundreds of people in a terrorist attack. It did not persuade, threaten or harass the defendant. Nor did it offer him any reward or appeal to his humanistic side to induce him to commit the attack. In addition to the facts set forth in the factual basis, a more thorough chronological review of the interaction between the defendant and the OCEs and UC is necessary for the Court to appreciate the level of unbridled enthusiasm the defendant expressed in his desire to kill. This review will also rebut the defendant's entrapment arguments as well as to provide the Court with the information necessary to support the government's recommended sentence.

On May 14, 2012, the government first interacted with the defendant through a response to his posting of "terrorist music" as he called it. Gov. Ex. OCE One 1.[8] The government initially engaged online with the defendant through two personas: OCE One, purportedly a 17-year old from Australia, and OCE Two, an older

---

[8] Government Exhibits labeled "OCE One" and "OCE Two" are communications between the defendant and two government online covert employees.

individual purportedly fighting in the Middle East. The purpose of the online engagement was to find out if the defendant was serious in his stated desire to commit violent jihad.

Although the defendant expressed a desire to either commit an attack in United States or travel abroad to fight, the OCEs never discussed a specific plot. *See generally* OCE One 1 - 95 and OCE Two 1 - 84. But after it was apparent from conversations that the defendant was serious in his desire to commit violent jihad, either in the United States or abroad, OCE Two introduced the defendant to the UC, purportedly OCE Two's cousin, a mujahedeen from Afghanistan who lived in upstate New York. The purpose of the introduction was to further asses the defendant's intentions and to control the situation so that the defendant did not either attempt an attack on his own or engage with other, real terrorists that could have used the defendant to commit an attack.

*First UC Meeting*

On July 17, 2012, the defendant met the UC for the first time. During the meeting, after a lengthy discussion during which the defendant explained his views on jihad, the UC told the defendant to think about jihad and how he wants to help the mujahedeen. A few moments later, the defendant told the UC that hated America and that Inspire magazine "does inspire" him. Gov. Ex. 7-17 Transcript at p. 106. The defendant told the UC, after the UC said "we" want to do an attack in America, that he wanted to go overseas but that he wanted to do something here at the same time. Gov. Ex. 7-17 Transcript at p. 108. The defendant told the UC some of his ideas on

how to commit an attack, including one from Inspire magazine which involved putting butcher knives on a truck and driving through a crowd. Gov. Ex. 7-17 Transcript at p. 116. As an initial step in determining the level of the defendant's commitment to commit an attack, the UC told the defendant to write down his ideas to discuss at a later meeting. Gov. Ex. 7-17 Transcript at p. 107.

*Second UC Meeting*

Their next meeting was August 6, 2012, when the defendant presented his list of ideas. A few weeks prior to the meeting, James Holmes walked into a movie theatre in Colorado and killed 12 people. Gov. Ex. 8-6 Transcript p.5 *et. seq*. The defendant referenced Holmes' actions and suggested a similar killing to the UC. "And it seems really easy to get away with. Anyone can sneak in a movie...People do it all the time. And not only that this guy bring a gun and there's like no security...and it's dark. So just give me an idea if we do the same thing." *Id*. The defendant went on to state that he doesn't know "how to do for like pinpoint" but continued to elaborate on the plan by suggesting they throw grenades in a multiplex or "shoot a bunch of people." *Id*. at p.6. He went on to compare the attack to a hadith discussed by Anwar al-Awlaki during which the "sahaba" went into houses that contained men, women and children but because it was dark, they couldn't see who they were killing. *Id*.

The defendant then proceeded to tell the UC about his other ideas for attacks that he researched, including the Woodland Mall that he intentionally chose because he "didn't want to get one that's right next to where I live." *Id*. at p.12. The defendant proposed attacking bars, "like a populated bar, I think it's usually at night so that it

makes it easier because of the darkness." *Id.* at p.23. The defendant liked the idea of attacking a bar because "you won't kill any Muslims for sure" but he believed that if he did kill Muslims it would be their fault for being in a bar. *Id.* The defendant also proposed attacking military bases and military recruiting centers because "these are people who are about to kill us." *Id.* at p.25-26.

The defendant viewed his role as planning the attack and the UC's role to arrange the attack. The defendant stated, "[T]he only thing I'm not really good at is the actual uh, uh doing of the operation. But all these ideas… I thought you could help with that. The only thing, the important things, okay, so the first one of the important things is the target…The other thing is uh, getting away with it…And the third thing is make it known it's a terrorist attack." *Id.* at 42. During this same meeting the UC and the defendant discussed the prospect of a car bomb. The defendant stated, "you can be creative but I mean for us it has to be cheap. So I mean like a car bomb is okay." *Id.* at p.163-164.

The defendant repeatedly emphasized to the UC that the world must know the attack was a terrorist attack committed by Muslims. He told the UC that "it's not going to make a difference unless they know a Muslim did it or a terrorist did it." *Id.* at p.8. He was afraid that if people thought the attack was similar to the "Joker thing" (referring to the Colorado movie theatre shooting) then they'll "forget about it after a week. But if we say it's a terrorist attack…they'll think, oh terrorism, will be scared, it'll be like frantic." *Id.* at 9. The defendant stated that, "We have to make sure that they know it's a terrorist attack. Right? The target has to be good. The

14

target has to be good. They have to know it's a terrorist attack and you have to be able to get away." *Id.* at p.43.

During this meeting, the defendant told the UC that "if it's only like five, ten people I'm not gonna feel that good…I wanted something that like's simple, massive, I want something that's gonna make it in the news like tonight." *Id.* at p.108. This was a desire the defendant repeated throughout most of their meetings.

*August 10, 2012, Skype Conversation*

The defendant was anxious to commit the attack but several times the UC tried to slow him down. Again, the government wanted to be sure of the defendant's intention. On August 10, 2012, the two communicated via Skype. The UC used the notion of his sheikh as a justification to inquire of the defendant if committing an attack was something the defendant wanted to do. Gov. Ex. UC 8-10 Skype p. 1.[9] The UC told the defendant that his sheikh said they cannot commit an attack during Ramadan. *Id.* The defendant was distraught. He told the UC that "that's not right. The Sahaba and many Mujahideen in the past fought in Ramadan…but he is not right." *Id.* The defendant launched into his justification for killing Americans during Ramadan. He told the UC that, "they killed our people and now it's time we killed thiers." *Id.* at p. 2. The defendant's negative reaction to a religious authority figure was one of several times he demonstrated his independence.

---

[9] Government Exhibits labeled as "UC [date] Skype" are skype communications between the defendant and the UC.

The defendant's desire to immediately commit an attack was partly based on his hope that he would be accepted to a school in Saudi Arabia. He told the UC that he wanted to commit an attack before he left, if he was accepted, but the defendant recognized that the UC was obligated to follow his "commander" and the UC could not commit the attack during Ramadan. *Id.* at p. 3. The defendant told the UC that they have two options – if he does not get accepted for that school year, they could commit the attack now, or if he does get accepted, they could wait until he returns. *Id.* The second option was for the defendant to commit the attack himself during Ramadan. *Id.* He told the UC to "give me the things I need for the operation for me to do, since I don't have a commander." *Id.* This statement exemplifies the defendant's willingness and independence, and, significantly, a lack of inducement on the part of the government. The defendant was driving the ship.

During this same Skype conversation, the UC again told the defendant that his sheikh wanted to make sure that jihad was in his (the defendant's) heart. *Id.* at p. 3. "Jihad is not something that others can force on you or pressure you to do." *Id.* The defendant replied, "[Y]ou can tell him how I reacted when you said we cannot do it in Ramadan. That is sufficient proof that this is in my heart." *Id.*

*August 14, 2012 Skype Conversation*

On August 14, 2012, the defendant and the UC continued a Skype conversation that began the prior day. During the conversation, the defendant suggested they attack Zero Gravity, an underage nightclub identified by his "sahaba." Gov. Ex. UC 8-14 Skype at p. 2 and 12. The defendant pushed back against the UC when the UC

told the defendant his friend was too young to participate in the attack. *Id.* at 3. The defendant then suggested they place a bomb on train tracks that "takes oil from a Muslim country." *Id.* at p. 5. The defendant expressed his hope that they could conduct multiple attacks before he traveled to Saudi Arabia for school. *Id.* at p. 5.

*Third UC Meeting*

The UC and the defendant met again on August 23, 2012. The defendant presented the UC with the "perfect place" to bomb: the Cactus Bar and Grill. Gov. Ex. 8-23 Transcript at p. 10. The defendant expressed to the UC his view that the Cactus Bar was a good target because, "lotta people go there, especially at night," "there's another liquor store right next to it," and because alcohol is on the premises it "makes it easier because it's flammable." *Id.* at p. 11-19. The defendant told the UC that he wanted to do the bombing that month due to his expectation that the crowds will be larger than normal because "they [Cactus] have these events that are going on between like August 10th to August 31st. Well that's perfect. That's the time range I wanna do it...That makes it, that means there's more people." *Id.* at p. 14. The defendant viewed the location as perfect. "Think about it okay. It's a bar, it's a liquor store, it's a concert. All in one bundle." *Id.*

The UC discussed with the defendant a story the defendant had previously told the UC about a sheikh at the defendant's mosque who told the defendant to stop talking about jihad. The UC used the story as opportunity to explore whether the defendant truly wanted to commit a violent attack. The UC told the defendant that "This has to be in your heart, especially jihad. You know it's in your heart. It's

17

something you believe in. It's something you either believe in it or you don't." *Id.* at p.25. The UC stated that he asked his sheikh if there were any fatwahs used to support jihad. *Id.* at p.24. The defendant replied, "well not just jihad. I mean uh, you know, umm killing Americans." *Id.* The UC responded that his sheikh was very concerned about the UC putting pressure on the defendant to commit an attack. The UC stated that his sheikh "wanted to make sure that you were not pressured by anybody in the masjid. That I'm not pressuring you to do this, or my sheikh says well he doesn't want to give you a fatwah or uh, verses from the Quran for from the hadith describing Jihad because he feels like he might put pressure on you to do it then. He says this is something that has to come from your heart." *Id.* at p. 25.

The defendant needed no convincing to kill. He expressed in no uncertain terms that committing jihad was in his heart: "Tell him [the UC's sheikh] I'm convinced…It does come from my heart." *Id.* at 26. He told the UC that he did not agree with his own sheikh's instructions not to commit jihad. The defendant described how his sheikh was "trying to brainwash us basically, right. But I, I actually sat and thought about it, then refuted it, but I couldn't, I couldn't tell him any of my refutations. I didn't want tell him because you know he might come over with some other stupid argument and I'd have to think about that. I don't wanna do that…I'm completely fine with this." *Id.* The defendant set his own path to jihad. The UC was just trying to determine how far along the path the defendant would go. The defendant was clear – he wanted to follow through.

18

The defendant acknowledged to the UC that, he "can't really do anything by myself. 'Cuz I don't have like training or anything…You know I mean like I don't know how to make a bomb. I, I've seen instructions." *Id.* at p. 28. The defendant went on to explain, however, that he always "wanted to do something here but I have no idea how to do it and get away with it" so he was planning on traveling overseas to places like Afghanistan or Yemen to fight. *Id.* at p. 29. The government gave the defendant the opportunity he desired but opportunity is not inducement. *Mayfield*, 711 F.3d at 434.

During this meeting, the defendant told the UC that he was "talking about Jihad even before I knew you and your sheikh and everyone else." *Id.* at 33. The defendant told the UC that he loved jihad and that the UC came along at the perfect time because the defendant could not do anything here but he would have if he could "because I was thinking I'm like listen, man, we're in the place that's killing Mus.. I wanna, I wanna conquer this place." *Id.* at 43. Later in the conversation the defendant told the UC, "Who is leading the crusade against Muslims is America. It doesn't make sense, not I'm living in America, and I have to go two thousand miles away to fight America. I'm already here." *Id.* at p. 60-61.

*Fourth UC Meeting*

The two met again on September 5, 2012. During the meeting the defendant told the UC about a guy at his mosque who tried to convince him that is was not good to kill civilians. The defendant did not accept the rationale. He told the UC that "even though that guy tried to convince me, I actually took what he said and I'm like, you

19

know he didn't even give real reasons why it's not okay…in my own mind, I refuted everything he said." Gov. Ex. 9-5 Transcript at p. 72.

During their meeting on September 5, the defendant reiterated that he's in "the home of like the most evil country, okay? And so it doesn't make sense for me to only go overseas to fight." *Id.* at p. 46.

During the September 5 meeting, the defendant and the UC discussed the plan. The defendant, who had conducted surveillance of Cactus, showed the layout outside of Cactus and explained where they could park the car bomb. The UC, in turn, explained the size of the bomb and the carnage that will ensue. *Id.* at p. 10 ("if it's parked here, it's gonna kill these people and it's gonna kill everybody inside the liquor store."). The UC warned the defendant that, "this is real." *Id.* The defendant, instead of expressing any hesitation or concern about the number of people he expected to murder, was instead happy that the bomb was big: "I was a little worried like, what if it's a small car, maybe we'll just burn half of it. That's not good." *Id.* When the UC told him it was a thousand-pound bomb, the defendant retorted, "[T]hat's actually nothing compared to the bombs they throw at us." *Id.* at p. 11.

The defendant again expressed his impatience to commit the attack. He asked the UC, "[I]f I said let's do this today, could, could, could you do it today?" *Id.* at p. 26. The UC continued to stall in order to give the defendant an opportunity to change his mind.

Later in the conversation, when the UC was explaining how to ignite the bomb, and that they would be far enough away to watch it explode, the defendant replied

that it's "like watching a movie." *Id.* at 29. The UC reinforced to the defendant that this was real and that "it's not a movie…people are going to die." *Id.* at 30. The defendant said, "that's okay." *Id.* The defendant than asked that they pray to get away with it and that they kill "a lot of his enemies." *Id.* at 32.

The UC warned the defendant about the impending destruction. He told the defendant that, "you should even look how much damage a thousand pound bomb can do." *Id.* at 29. The UC again asked the defendant if he was ok with killing, with "knowing people are gonna die." *Id.* at 41. The defendant replied, "[Y]eah, that's the point. I was telling you, listen, the first time we ever mentioned the operation I said the operation is like I don't mind as long as enough of them die." *Id.* He later said that he would feel upset if only "five or twelve people died…I wanted like a thousand people to die." *Id.* at p. 44. The UC emphasized the impending carnage to make sure the defendant understood what was going to happen: "Everybody in that building, everybody in that restaurant or café grill and the liquor store and across the street and next, they're all gonna die." The defendant replied, "I said to myself, it has to be at least a hundred people." *Id.*

The UC, again in order to make sure the defendant wanted to commit an attack here, reminded the defendant that when they first met, the defendant stated that he wanted help to travel overseas. The defendant said, "I'm in the home of the leader, the leader of the crusades…the home of the like the most evil country…and so it doesn't make sense for me to only go overseas to fight…The thing is I want to go overseas, you know. And I wanna fight and die over there…and obviously die a

Shaheed. Like over here my, my goals isn't to die a Shaheed, although I want to die a Shaheed. My goal over there is to die a Shaheed, but my goal over here is to hurt the enemy." *Id.* at 45-46. After the defendant expressed his goals, the UC asked again if the UC was pressuring him. The defendant replied, "You can't make someone do jihad." *Id.* at 47.

*Fifth UC Meeting*

The defendant and the UC met again on September 13, 2012, the night before the planned attack. The defendant reiterated that he wanted to kill hundreds of people. In a chilling moment, he then said, "I do more next time." Gov. Ex. 9-13 Transcript at p.25.

The defendant also expressly stated he wanted to participate in the attack. He told the UC, when they were viewing the bomb, that he wanted to "be a big part of this. I still wanna do, um, like directly take part." *Id.* at 45.

The defendant told the UC of his worst fears, that he would live to be old, with kids and grandkids but would never have committed jihad. "I'm always afraid I'm gonna keep talking and I never do anything. That would be the worst thing…My nightmare would be to live a full life of like eighty year…I don't wanna be like that. You know, how could somebody be okay in this country. I mean you're living with like, you're living with enemies." *Id.* at 60-61.

During the September 13 meeting, the UC asked the defendant what was motivating him to kill people. The defendant replied, "Allah guided me on this path. You know what I mean? It's like um, you know all these people ask me like what got

you into Jihad? I had to think about it. I, I shouldn't even have to think that much about it. I knew I was into it at least three years ago. At least…but I started talking about it more this and last year." *Id.* at 73. In another chilling moment, he said, "I want Allah to use me to destroy this country." *Id.* at 74.

*Sixth UC Meeting*

The night of September 14, 2012, was the attack. The defendant and the UC drove from the suburbs to downtown Chicago where the car bomb was parked in a garage a block away from Cactus. During the drive, the defendant prayed to "make us successful in this operation…make us invisible to the kuffar…make us kill lots of enemies…make it international news…put terror in the hearts of your enemies, put terror in the hearts of their cooperatives…put fear in their hearts. Allah, make this successful and make us successful in this operation and every other operation in the Jihad and cause." Gov. Ex. 9-14 Transcript at p.13-16.

When they arrived at the garage, the defendant got into the car with the bomb, drove it to Cactus, parked it in front, and then walked back to meet the UC in a nearby ally. The defendant then pushed the button believing that the car would explode and hundreds of people would die. Thankfully, that did not happen.

> ### 3. The defendant decided for himself that killing innocent civilians was justified, despite attempts by the OCEs to talk defendant out of this view.

The government never had to convince the defendant to commit jihad or provide him with the justification he was looking for. The defendant conducted his own research ultimately coming to his own conclusion that it was "halal" to kill

Americans. In fact, the OCEs repeatedly tried to talk defendant out of a belief in killing innocent civilians, but the defendant rejected their arguments.

On May 13, 2012, the day before his first encounter with the FBI, in a theme repeated throughout the evidence, he told a third party on YouTube that he did

> research myself. I don't blindly follow a sheikh and if i do prove it [,] because i don't. I study Quran and sunnah and then i study from the scholars. I don't blindly follow anyone. I hear both sides and decide what's right. Innocent civilians? may i remind you that the government does false flag attacks and blames it on the Mujahideen? but you would rather belief kufaar…the best scholars are those who preach, write, and FIGHT IN THE WAY OF ALLAH. No it's the ones who know the Deen and carry the sword for the sake of Allah. And their souls are in green birds in Paradise and Allah is pleased with them.

Gov. Ex. YouTube 16 at p.3.

On June 2, 2012, the defendant, during the course of his research, posted on a jihadist web forum that he believed "burning houses, forests and things like 9/11" are permissible because of Quranic verses including a story about "sahabas" going to people's houses at night and killing women and children because it was dark and difficult to see. Gov. Ex. Deen Haqq 2.[10] The defendant, however, questioned killing Americans in crowded places such as markets, planes or trains, as suggested by Inspire magazine. *Id.* He asked members of the forum for guidance.

On June 11, 2012, the defendant posted, on the jihadist web forum Jamia Hafsa, known as JHUF, a similar question. He stated that he would be convinced if there was "a hadith where some sahaba went to a market of Persia or the pagan arabs

---

[10] Government Exhibits labeled "Deen Haqq" are the defendant's postings on a private web forum.

or someone they were in war with, and killed people in their markets." Gov. Ex. Broadband 5.[11] The defendant concluded his question by stating that he "support jihad in the cause of Allah but i also do not blind follow anyone so can i get evidence of these things." *Id.* Mujahid 313 responded to the defendant's question. *Id.* He told the defendant that the "short answer is that the people support their army. They are the ones who allow innocent countries to be invaded. how? bcz of democracy. in democracy people accept that whoever gets elected will be our leader. the decision of the leader will be the decision of the people. they are like the army. army is directly killing muslims and the people are supporting them by their wealth and will." *Id.* Mujahid 313 then directed the defendant to speeches that support this justifications. *Id.*

The defendant agreed with Mujahid 313's justification. The defendant replied "ok a LOT OF PEOPLE HERE (in america) support the military. the democracy argument is clever." *Id.* The defendant then stated that he read that the Freemasons run the country because every president was a Freemason, "So my point is no matter WHO they pick the person is going to attack Muslims because it's part of the American agenda." *Id.* The defendant then railed against people who don't support war, "Also, what makes me angry is that the people who DON'T SUPPORT WAR, don't support war, not because the poor Muslims, who are innocent, are being massacred, NO, it's because they want their POOR DEAD SOLDIERS TO COME

---

[11] Government Exhibits labeled "Broadband" refer to items from the defendant's internet activity.

BACK SAFELY!!!!" *Id.* The defendant questioned the strength of the democracy argument because he did not believe America is a true democracy but he said "it is a start of thinking." *Id.* The defendant told Mujahid 313 that he would view the recommended speeches but he continued to question whether it is allowed to kill random people on a plane, train, or market. *Id.*

On June 20, 2012, the defendant discussed his thoughts on this issue with OCE Two. He told OCE Two that he posted the question (above) on two sites but he

> didn't get a completely satisfying answer. even in inspire they made me MORE convinced but not entirely! My problem is like when they say people CHOOSE the government, when in reality they don't. All the presidents or president-elects for example were free masons and they all have the same agenda. but what makes me DO THINK they are halal to kill is that more of them support the military! they are patriotic and they support their evil country! even the ones who are ANTI war are only against the war cuz it costs money, or the lives of THEIR TROOPS. It's insane these people i BET you if they were told to kill muslims in america they would do it.

> Gov. Ex. OCE Two 48.

The government, aware of the defendant's prior posts and questions, attempted to foster his hesitations about killing civilians and nudged him to talk to his parents before he did anything. On June 21, 2012, OCE Two told him "I think you should be careful about who we should kill and I believe that your concerns make sense…This is similar to the question of whether a young Muslim should seek the permission of his parents before joining jihad." Gov. Ex. OCE Two 49.

The defendant replied that he does not mind killing someone "IF IT COUNTS AS JIHAD. i would want to make sure i get the correct understanding by the Quran and sunnah. So killing someone is not something to take too lightly. and i also want

to have full complete understanding and not blindly follow anyone." Gov. Ex. OCE Two 50. He then pushed back about talking to his parents, telling OCE Two that he does not have to ask his parents' permission if the jihad is "fard," defensive jihad. *Id.*

The government continued to try to fuel the defendant's doubts and take him off the path of jihad/killing civilians. On June 28, 2012, OCE One told that defendant that he had been reading but that "the more I read the more I begin to question what I want to do. The hardest time Im having is with crossing the line and actually doing jihad. Akhi im really struggling with the issues of taking lives…And like you said akhi I should do my own thinking and searching." Gov. Ex. OCE One 43.

The defendant was not budging. He responded to OCE One "the issue of taking lives is an important issue. I have been studying this issue and I have made some conclusions and I can fill you in on what they are based on the Quran and sunnah, and the evidences they give." Gov. Ex. OCE One 44. He told OCE One to keep reading because "the issues [Inspire] kinda complete each other." *Id.* The defendant then told OCE One that he has ideas and that he may go overseas to commit jihad and OCE One could either go with him or commit operations in the U.S. on his behalf. *Id.*

By June 30, any doubts or hesitations the defendant had melted away. He had convinced himself that killing Americans was justified because he believed they were not innocent. He told OCE One his conclusions:

> yea, keep reading Inspire, Insha'Allah they have this issue a lot. The thing that makes american legal targets is the fact that they have no legal treaty with the Muslims (they don't have a contract, they don't pay Jizya [taxes]), they are in a country that is in a war with Islam and Muslims. Furthermore, most of them give moral support to their

country, the actions of their government, their troops, etc. Even those who are against the wars are against Islam…Evil evil is this land.

Gov. Ex. OCE One 46.

The defendant provided further justification, "they also VOTE for the leaders who kill us every day. So in Islam there are combatants and noncombatants. Combatants can be someone who supports the war with their words (morale) money or arms. So that is why they are legal targets. So I took this from inspire, Shaykh anwar al awalki, ayman al zawahiri, myself (from what I see here)." *Id.* He went on to state that his "own personal opinion though is since you cannot kill All americans to only target good targets that will really hurt america as a whole (or the area where the target is) and to kill those necessary to do so (while avoiding targeting women or children unless its impossible or really difficult to do so)." *Id.*

At this point the defendant was firmly on the path to jihad and was introduced to the UC.

The defendant may have told the OCE to avoid targeting women and children, and he, shortly before the attempted to blow up the bomb, asked the UC for confirmation that it was ok to kill women and children, but his actions belied his words. The defendant chose targets knowing that woman and teenagers would be killed. On August 14 the defendant suggested to the UC that they use two bombs to attack Zero Gravity, an underage nightclub that did not serve alcohol and was populated with "all these filthy people go there and use drugs and alcohol." Gov. Ex. UC 8-14 Skype at p.12. The defendant also chose the ultimate target - Cactus Bar – which he knew would be likely filled with women and men.

### 4.    Defendant Recruited His Friends to Jihad

An additional aggravating factor is the defendant's active attempt to recruit his friends to join him in jihad. He sent Jihadist material to multiple friends including: *The Book of Jihad* (Gov. Exs. Email 1, Email 2, Email 3, Email 11); "Here you go buddy. your first book towards terrorism" (Gov. Ex. Email 20); *Let's Continue Our Jihad and Sacrifice* (Gov. Ex. Email 18); *44 Ways to Support Jihad* by Anwar al Alwaki (Gov. Exs. Email 24, Email 26, Email 27); Anwar al Alwaki videos (Gov. Exs. Email 8, Email 15, Email 25); Abu Mansoor al-Amriki video (Gov. Exs. Email 14).[12] The defendant directed them to forums that he described as "terrorist" (Gov. Ex. Email 16; Gov. Ex. UC 8-10 Skype at p.9, "I got dem to join a jihad forum"); and he sent Inspire magazine to OCE One, whom he believed was around his age (Gov. Ex. OCE One 10).

He talked about "brainwashing" his friends with this material. Gov. Ex. Text 5.[13]  He told OCE One that he needed "people who are devoted. If i don't start my own group (where i am from) then i will go overseas. I'm trying to invite people to go with me to the cause of Allah. but man is hard to tell people to be terrorists." Gov. Ex. OCE One 24.

During a Skype chat on August 10 regarding attacking a mall, the defendant told the UC that he had been discussing targets with one close friend who was willing to assist in an attack. The defendant said he had another friend who was afraid of

---

[12] Government Exhibits labeled "Email" are emails from the defendant's email account.

[13] Government Exhibits labeled "Text" are text messages from the defendant's phone.

getting caught and not being able to travel overseas. Gov. Ex. UC 8-10 Skype. The UC told the defendant that his friends cannot help because they're too young. Gov. Ex. UC 8-14 Skype at p.3.

The defense criticizes the government for "escalating the investigation" and ratcheting up "its sting operation." Defendant's Version at 14-15. The defense also argues that the UC attempted to isolate the defendant by instructing him not to speak to anyone else. The defense samples portions of conversations between the defendant and the UC, which do not accurately reflect the situation. The defense ignores the large volume of evidence which shows that before the government ever interacted with the defendant, he was in pursuit of a path to commit violence against innocent people. It was not a matter of if, but when. The government's intervention, which was a progression designed to assess whether the defendant was serious and included many opportunities for him to back out, likely saved lives. The government did not entrap the defendant nor did it encourage him.

Although the defendant may not have been able to commit this type of attack on his own, the government actors, in particular the UC, left the type of attack and the location up to the defendant. The UC asked the defendant if this was something that was in his heart and gave the defendant multiple opportunities to back out. The car bomb constructed by the government contained multiple bags of fertilizer and had a strong smell of gasoline – it was a real but inert bomb. If the defendant did not have an appreciation for what he was about to do, then seeing the bomb in person, knowing

the destructive power of the bomb, made it real. If the defendant was not committed, this was an (another) opportunity to back down. Instead, the defendant got excited.

As demonstrated through the preserved communications between the government and the defendant, at no time did the government encourage the defendant to commit this attack. When viewed in its entirety, there was no government inducement, there was no entrapment.

> **5.  Defendant solicited the murder of the UC without any inducement by the government, was predisposed to do so, and was not coerced by the CHS.**

The defense has also argued to the Court that the defendant was entrapped when the defendant solicited the CHS to have the UC killed. The defense has alternately argued that the CHS set up the defendant as a means of obtaining his release or that the government set up the defendant to put pressure on him. Both theories are preposterous and are not based in fact. A review of the recorded interactions between the defendant and the CHS are warranted to apprise the Court of the defendant's desire to commit this plot.

The defendant's motivation for killing the UC was twofold: One, he believed he had to for God because he viewed the UC as a "kaffer" and a "hypocrite" for being Muslim. Second, defendant wanted to make his case disappear.

The defendant was predisposed to kill the UC long before he was arrested. On August 14, 2012, during a Skype conversation, the defendant told the UC that his "sahaba" believed the UC was a "spy." Gov. Ex. UC 8-14 Skype at p.4. The defendant said "i tell this to people dat if dey a spy i will kill them. i don't really take this dat lightly." *Id.* On November 25, 2012, the defendant explained to the CHS why it was

OK to kill the UC because the UC "knows he's a hypocrite and spy. That's the reason why it's OK." Gov. Ex. S219-1 p. 2.

Once he was housed with a high-ranking gang member, the defendant saw an opportunity to carry out his plan to kill the UC. He offered the CHS $20,000 to kill the UC and provided the CHS with the UC's phone number. On November 23, 2012, the defendant and the CHS discussed how the defendant wanted the UC to be killed. The defendant said, "I don't care, as long as you can shoot him and he's dead. It has to be quick, it has to be efficient and you have to make sure he's dead…It doesn't matter how it's done, just so it's done. I don't wanna torture him…He's just gotta die…Like my wish, bomb, gun, knife, car." Gov. Ex. S4-1 p. 5. The defendant continued to insist that the CHS make sure the UC died. "Some people get shot like ten, one time, get shoot ten times in the head and he still lived. But almost a guarantee like if you cut off his head. You know what I mean? Then you don't have to worry." *Id.* at p.6. Later, the defendant reiterated, "But I'd like to kill him. He needs to die…I don't care as long as it's quick, quiet, fast. Don't leave anything behind. Don't leave, I don't know, don't leave no prints." Gov. Ex. S8-1 at p.2.

The CHS made sure the defendant understood that the decision to kill the UC was the defendant's. The CHS told the defendant that they need a plan. He asked the defendant, "I'm trying to see what you want without giving you no ideas. It could go however you want it to go" and "It's your 20 g's, baby. However you want it done." Gov. Ex. S7-1 at p.1. The defendant responded, "I just care that he gets it done and he gets away and no one can find us, right?" *Id.* at p.2. The CHS asked the defendant

at what point the defendant decided the UC had to die. The defendant said, "I didn't have to think about it. I was already thinking about how to do it." Gov. Ex. S7-2 at p.2.

Daoud was eager to have the UC killed. He told the CHS that he wanted the UC killed "as soon as possible." Gov. Ex. S217-1 at p.2.

Several times the CHS gave the defendant an opportunity to change his mind. The defendant never did. "Like, you know after it's all said and done…then you (UI) then you wouldn't have did it?" Gov. Ex. S217-2 at p.2. The defendant replied, "who do you think I am? I think you should at least give me some credit." *Id.*

The CHS asked, "When this thing's finally over with though, right? Are you gonna just leave me the fuck alone though?" Gov. Ex. S391-1 at p.2. The defendant responded, "No, I'll trust you more and I'll see you as more reliable." *Id.* The CHS said that he's "not killing nobody else, no matter how reliable you think I am. This is the end of the road for me buddy." The defendant responded, "I don't need anyone else killed right now." *Id.* at p. 3.

The day before the supposed murder of the UC, the CHS again gave the defendant the opportunity to change his mind. The CHS asked the defendant if he was having second thoughts. The defendant replied that he was "so angry," and that he just wants to a guarantee that he [the defendant] will be ok and will not get in trouble, "like, I won't get in trouble. Then, take care of it." Gov. Ex. S476-1 at p.4.

The trigger to confirm the defendant wanted the UC killed was a phone call he was instructed to make with a code term: "How is Uncle Mike." The defendant did

not hesitate and took the first opportunity to make the call to set in motion the murder. Gov. Ex. S491-1. After he told the CHS that he made the call, the CHS asked if he regretted it. The defendant replied, "Hell no." Gov. Ex. S505-1 at p.1.

On November 29, the CHS told the defendant the UC was dead. The defendant expressed his relief and his gratitude. "That's good man. I can't stand the spy. (UI) FBI (UI) to die. That solves my worries." Gov. Ex. S567-1 at p.3. The defendant then said, "[A]t least the first person I killed was a hypocrite." Gov. Ex. S572-1.

The defense has argued that the CHS "threatened and verbally accosted" the defendant. Defendant's Version p. 28 - 29. In support of their position, they cite insults the CHS made to the defendant, to include calling the defendant gay, stupid and threatening to kill the defendant. The defense's picture of the relationship between the CHS and the defendant is inaccurate: the defendant gave it back to the CHS as well as he took it, including threatening to kill the CHS. During one recording, the CHS asked the defendant if he's not paying if the UC is not killed. The defendant replied, "You said you gonna take him down, I expect him to be down." Gov. Ex. S315-1 at p.2. The CHS responded, "So what if he's not down, are you gonna kill me?" *Id.* The defendant said, yes, "kill you…someone has to die." *Id.* The defendant called the CHS "gay" and a "homosexual" several times (Gov. Ex. S405). The defendant called the CHS a "jerk," "stupid," and "a wuss" (Gov. Ex. S478), "a retard," (Gov. Ex. S481), "a whore" (Gov. Ex. S484), a "nincompoop" and "inferior" to the defendant (Gov. Ex. S667). If the defendant was intimidated, threatened and coerced by the CHS, it is highly unlikely he would have insulted a gang member who had

admitted to committing murder. As the prison recordings reveal, the defendant and the CHS were engaged in friendly and playful banter that involved insulting each other.

> **6. Defendant was not legally insane when he attempted to murder his fellow inmate; instead, he acted consistently with his long-held and previously stated beliefs.**

The defense has claimed that the defendant was legally insane or was suffering from several mental illness, when he attempted to murder an inmate who had drawn a picture of the Prophet several months prior. The defendant, however, acted rationally and had years earlier threatened to kill anyone he believed insulted the Prophet or his religion. During his first meeting with the UC, he asked if there's a fatwah on Shia's because of perceived insults they made against historical religious figures. The defendant said, "Honestly, I think I would kill 'em if someone says something like that in front of me." Gov. Ex. 7-17 Transcript at p. 57.

Prior to his arrest, the defendant messaged another individual on YouTube in response to deceased designated terrorist Anwar al Awlaki's video called "Dust Will Never Settle," "may Allah give anwar al alwaki the highest place in paradise! YES! I JUST READ ABOUT THIS! THEY WANT TO MAKE BLASPHEMY ABOUT THE PROPHET (MAY ALLAH'S PEACE AND BLESSING BE UPON HIM) THEY CAN COME TO ME. WAIT LET ME BRING MY KNIFE. LOL LOL." Gov. Ex. YouTube 3A.

On May 18, 2012, defendant told OCE One, "hahaha see this nasheed. this was in response to those filthy pigs who drew pictures of the prophet (may Allah's peace and blessings be upon him)." Gov. Ex. OCE One 8.

On May 20 and 22, 2012, defendant posted several comments on YouTube in response to a YouTube Video by a celebrity who advocated in defense of a third person who promoted a "Draw the Prophet Day." The defendant first wrote, "ok. it's not ok to draw a picture of ANY HUMAN BEING in Islam, not just the prophet.They are drawing him to not only bother Muslims but to insult the prophet and commit blasphemy. THAT'S WHY IT'S A BIG DEAL." Gov. Ex. YouTube Posting 2, p.13. On May 22, the defendant then wrote, "it's not like they made a cartoon that just happened to have Muhammad. No it's like they are purposely making pictures and insulting him. But if a comedian makes a few Jewish jokes he could be kicked out from ever going up there again. This is what america stands for. Hypocrisy not freedom." *Id.* The defendant finally wrote, "if it's your freedom to make blasphemy against our prophet (may Allah's peace and blessings be upon him) then it's OUR freedom to kill those who do it. (as it's part of OUR religion)." *Id.*

The defendant's attack was premediated and thought out. He whittled toothbrushes into sharp knives, he attached a razor blade to one and he lulled the victim into believing they were friends. The defendant attacked the victim while he was sleeping and afterwards had the forethought to destroying evidence of his crime by flushing his weapons down the toilet.

This was not an act of insanity or of any mental instability but an act, he believed, in defense of his religion.

### 7. **Imperfect entrapment is not a mitigating factor in this case.**

The defense has informed the Government that it will argue imperfect entrapment as a mitigating factor.

There is no Seventh Circuit authority for imperfect entrapment but it has been described by the Second Circuit as a "departure based on 'conduct by the government that does not give rise to an entrapment defense but is nonetheless aggressive encouragement of wrongdoing.'" *United States v. Sokoya*, 2007 Wl 4198244*6 (N.D.IL 2007), *citing United States v Bala*, 236 F. 3d 87, 92 (2nd Cir. 2000); *United States v. McClelland,* 72 F.3d 717, 724-725 (9th Cir. 1995) (citing *United States v. Garza-Juarez*, 992 F.2d 896, 912 (9th Cir. 1993)). The use of imperfect entrapment should however, be limited. *United States v. Dickey*, 924 F.2d 836, 841 (9th Cir. 1991).

Imperfect entrapment finds it roots in the non-binding policy statement of U.S.S.G. Section 5K2.12. *Bala*, 23 F.3d at 92. Section 5K2.12 states that "if the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may depart downward…Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from unlawful action of a third party." The defendant has not presented any evidence that involves any threats made by any government actor

37

against him that would fit within the requirements of imperfect entrapment. *Sokoya*, 2007 Wl 4198244*6.

The defendant's case is a striking example of a predisposed defendant who was actively *discouraged* from engaging in the underlying criminal conduct. The touchstone for determining whether a downward departure is warranted is whether there is "*aggressive* encouragement of wrongdoing." *McClelland*, 72 F.3d at 725 (emphasis added). As set forth in this sentencing memo, and as the Court will hear during the sentencing hearing, there was no encouragement of wrongdoing. The Court should not consider this argument in mitigation.

### C.    History and Characteristics of the Defendant

#### 1.    Defendant's Background

There are no salient characteristics or events in defendant's background that support a reduction in sentence under 18 U.S.C. § 3553(a). In many respects, the defining characteristics of defendant's background—a supportive family and the absence of any criminal history—are aggravating factors that this Court should consider in fashioning an appropriate sentence. Simply put, defendant possesses more ability and has been given more opportunities to succeed than many young men that come before this Court, yet he chose to embrace an ideology and a criminal scheme that led him to attempt to destroy hundreds of innocent lives. Although the defendant was young when he committed his first offense, and at that time did not have a criminal history, his age is not a justification for the violent acts he attempted to commit and did commit.

### 2. Mental Health

#### a. Defendant's claim that he is "vulnerable and susceptible to influence" is not supported by any evidence.

The defendant has argued that he suffered from mental health issues that made him "vulnerable and susceptible to influence." This claim is not supported by any evidence.

There is no evidence that the defendant suffered from any mental health issue during the commission of the first two offenses. Although the defendant's viewpoints on the world may be different than most people, he did not act in any manner or say anything that would indicate he had a mental health issue. He spoke and acted rationally and intelligently. He knew that killing innocent people was wrong. But he came to the conclusion, on his own, after listening to lectures by Bin Ladin, Alwaki and others, and after reading Inspire magazine, that Americans are not innocent, thereby justifying in his mind the legitimacy of killing them. This is not a result of a "severe mental illness," but rather, of considered deliberation.

The 2016 diagnosis of delusional disorder by Dr. Xenakis was based upon the defendant's belief that, at that time of the exam, the government, his attorneys and the Court were conspiring against him. There is no evidence, however, the defendant harbored any conspiratorial delusions or hallucinations prior to his arrest.

Dr. Xenakis (and government psychologist Dr. Wadsworth) focused on the defendant's mental state at the time of their examination. The defense is improperly attempting to take the diagnosis and apply it retroactively to the defendant's conduct of several years prior, under different circumstances. But there is no evidence that

the defendant suffered from any mental health issues during the commission of the first two offenses. To the contrary, any mental health issue did not arise until after he had been incarcerated for a period of time. As this Court has observed, "Daoud's demeanor and his letters to the Court suggest that his mental state is deteriorating. Undoubtedly, his lengthy pretrial incarceration, often spent in isolation, and approaching its fourth year, coupled with the trauma of witnessing his cellmate's attempted and then successful suicide, have only contributed to his mental issues." Doc. No. 216.

Moreover, Dr. Xenakis' report, which was intended to only address the issue of competency to stand trial, is primarily based on his interview of the defendant, who informed Dr. Xenakis that he was paranoid and, despite his misgivings, went along with the UC's proposals. Dr. Xenakis failed to conduct any independent research and per his report, interviewed only his parents, whose statements are noticeably absent from his report, and a brother. The defendant's sister, on the other hand, told the government on the night the defendant was arrested, that he had no mental health issues. Most concerning is that Dr. Xenakis had access to but did not review any of the evidence that was gathered contemporaneously with the offense that would have painted a different picture of the defendant. He had reviewed the evidence (which includes many recordings of the defendant expressing his violent beliefs and plans) and conducted a fulsome analysis, he would have been in a better position to opine on the defendant's mental state during the commission of the offenses.

The government is not the only one who had questions about the quality of Dr. Xenakis' opinions. Judge Lee, during the sentencing hearing of Hasan Edmonds, *United States v. Hasan Edmonds*, 15 CR 149-1 (N.D. Ill. J. John Z. Lee, September 20, 2016), put it best when he said:

> Defense counsel also argues that Mr. Edmonds is truly remorseful and points to the letter provided by Dr. Stephen Xenakis. But in that point, having reviewed the letter multiple times, I agree with the government that the report has minimal persuasive value because the doctor's conclusions that appear on page 7 of the letter are almost exclusively based upon defendant's own post-conviction statements, the reliability of which is suspect at best.
>
> For example, the letter notes that defendant did not know about the plan to attack the National Guard installation until he got in the car with his cousin and the undercover agent on March 24, 2015. But the record clearly indicates that they were planning the attack the day before. *The Court finds that defendant's prior actions before he was arrested speak much louder than his post-conviction statements to Dr. Xenakis as part of sentencing. Accordingly, I give the letter from Dr. Xenakis little weight.*
>
> *United States v. Hasan Edmonds*, 15 CR 149-1 (N.D. Ill. J. John Z. Lee, September 20, 2016) (emphasis added).

While Dr. Xenakis may have been able to provide an opinion based on the defendant's mental state at the time of his interview, conducted years after the offenses, he is not able to provide an opinion on the defendant's mental state at the time of the offense. In short, for some unknown reason, Dr. Xenakis, did not review the large volume of records of defendant that are the best evidence of his state of mind Thus, the government has serious concerns about the reliability of Dr. Xenakis'

opinion regarding the defendant's mental state and mental health at the time he committed the offenses.[14]

> **b.** **Defendant was not legally insane when he attempted to murder his fellow inmate; instead, he acted consistently with his long-held and previously stated beliefs**

There is nothing in Dr. Xenakis' report that identifies the delusional disorder as the cause of the defendant's violent behavior or religious beliefs. Nor is there any reason to believe that, while on medication, defendant is not still violent. Defense counsel has stated that, on medication, the defendant appears to be more stable but he has not demonstrated to this Court that he is no longer violent, will not commit an attack or try to harm someone, or travel overseas to join a terrorist organization. Factoring into this concern is the defendant's complete lack of remorse for his conduct or his acceptance responsibility for his actions. The only conclusion that can be drawn from the record is that defendant still holds the beliefs that led him to plan a terrorist attack, hire a gang member to kill an FBI agent, and attempt to kill his cellmate with a "shiv."

A more plausible explanation for the defendant's behavior is his adherence to an ideology of radical jihadism that is perverse but is preached by certain religious leaders admired by the defendant. Acceptance of this belief does not equate to mental illness. "Radical jihadism is not a clinical condition…Radical jihadism is an ideology

---

[14] The government set forth these and other concerns regarding the quality of Dr. Xenakis' examination in its Motion *In Limine* to Exclude the Opinions And Testimony Of Dr. Stephen Xenakis (doc. # 186).

– and can be embraced by the psychiatrically sane and insane alike." *Radical Jihadism is Not a Mental Disorder*, by Dr. Stephen N. Xenakis, Washington Post, December 5, 2010.[15] As defendant told the CHS, "I kill for God," and "You don't hear God directly. Like, you pray to God and you ask him [to] forgive you, you ask for things, but you don't directly hear from God. You know what I'm saying? I think God allows this and that God doesn't allow that. I'm basing my knowledge based on what I know about the religion…I'm not telling you that yeah, God told me last night to kill this mother fu…You know what I mean? It's not like that." Gov. Ex. S406-2 at p.5. Defendant also told the CHS that once released, he plans on traveling overseas for jihad.

It may have been delusional for the defendant to say his attorney is a lizard, but it's not delusional to read Inspire magazine and find its articles persuasive. It may be delusional to say the government is trying to kill him, but it's not delusional to believe the UC, who was part of the investigation, was a spy. It may have been delusional to believe an alien species govern the United States, but it is not delusional to listen to lectures by Anwar al-Awlaki telling people to defend the honor of the prophet and then attack a person who drew a picture of the prophet.

Adding to the concern that the defendant may continue on his path to jihad is Dr. Xenakis' opinion that the defendant is "susceptible to influence, particularly to individuals purporting to be of, or identifying with Islamic religious authority." Def.

---

[15]http://www.washingtonpost.com/wp-dyn/content/article/2010/12/10/AR2010121002498.html

Expert Witness Notice dated Nov 20, 2015. It seems clear that defendant is not susceptible to those who try to mitigate his violent views. First, defendant's own statements that one needs to make up their own mind and defendant conducted his own research about violent jihad. As explained above, defendant has rebuffed moderate religious figures that are part of his community. Second, to the extent Dr. Xenakis is correct, however, it appears that defendant is only susceptible to jihadist figures. Defendant stated multiple times that he supports Osama Bin Laden, Anwar al-Awlaki and other radical, violent figures, while refuting the warnings about jihad from religious figures close to him. Third, there is every reason to believe, based on his conduct and statements both before and after his detention, that upon release he will continue with his violent ways. The defendant told the CHS that he did not want to do another operation here but that he will travel to Saudi Arabia to "get into direct action" so he can die there. Gov. Ex. S6. The defendant believed that dying in the battlefield is a "ticket to paradise." *Id*. The most telling proof that the defendant is still dangerous comes from Abdulla Tounisi, the "sahaba" he often talked about with the UC, his close friend who was convicted of providing material support to a foreign terrorist organization and who interacted with the defendant while at the MCC. Tounisi stated, "Daoud has no intention of putting his jihadist views or plans behind him." Gov. Ex. Tounisi 302.[16]

---

[16] Abdella Tounisi is not, and has not been, cooperating with the government but has met with the government. During a meeting Tounisi also stated that Daoud expected to be released on an insanity defense but that Daoud is not insane and he knows the difference between right and wrong. Tounisi was sentenced to the statutory maximum of 15 years. *United States v. Tounisi*, 900 F. 3d 982 (7th Cir. 2018).

Section 5K2.13 of the Sentencing Guidelines states a downward departure for mental health "may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." The accompanying application note defines significantly reduced mental capacity to mean "the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or exercise the power of reason; or (B) control behavior that the defendant knows is wrongful."

There is no evidence that the defendant suffered from a "*significantly* reduced mental capacity" or that any mental incapacity played a role in the defendant's decision to engage in the offenses. Even assuming the defendant suffered from some mental health issue during the time of the offenses, because of the nature of the offenses and the need to protect the public, that is not a basis for a departure. As U.S.S.G. 5K2.13 states, "However, the court may not depart below the applicable guideline range if... (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence." That is precisely the case here.

In *United States v. Lutchman*, 910 F.3d 33 (2nd Cir. 2018), the defendant pled guilty to one count of providing material support to a foreign terrorist organization after he planned to, with two individuals who were cooperating with law enforcement, attack individuals at a restaurant in upstate New York. The defendant had used

---

social media accounts to express support for ISIS and to share ISIS propaganda in the form of images, videos and documents promoting terrorism. *Id*. at 36. The defendant claimed that he was entitled to a Guideline departure because he was assisted by government informants and "would have been unable to purchase weapons or successfully complete the attack without their help. *Id*. at 39. The court rejected the defendant's request and found that his conduct "advanced the substantive offense…to the verge of fruition." The defendant also argued that mental illness was a mitigating factor. The district court considered his long history of mental health issues and, found that the mental health "cut both ways, the court concluded that the only way to protect the public from further crimes was to impose the maximum sentence" of 20 years. *Id*. at 40.

### D.  A 40 Year Sentence Is Necessary Based upon the Crimes Committed

#### 1.  The Seriousness of the Offenses

The sentence imposed by this Court must fit the crimes committed and reflect how very seriousness each offense was. The government cannot imagine a crime more serious and callous than mass murder of innocent victims. In this case, defendant believed he was going to maim and kill hundreds of people by detonating a bomb. He did not know the bomb was inert. He fully expected murder and mayhem when he pushed the button to detonate the bomb. The seriousness of the offense in this case is unique. Defendant wanted to carry out an act of terrorism that would maximize human carnage. Defendant's motivation to commit this remarkable act was well established prior to his first meeting with the UCEs.

Couple this with the attempt to kill an FBI agent and the attempt to kill a fellow inmate, and the crimes collectively warrant a sentence that is lengthy.

A sentence of 40 years—and no less than 40 years—is the minimum appropriate sentence for this defendant and the crimes he intended to and did commit.

## 2.    To Promote Respect for the Law

There can be no greater evidence of a lack of respect for the law than someone who attempts to kill a law enforcement officer after they have been arrested. A sentence of 40 years is appropriate to help instill in the defendant the respect that law needs and deserves from the public.

## 3.    Protection of the Public and Deterrence

The only way to effectively protect the public from defendant is to impose a lengthy prison sentence.  Defendant's desire to kill was not impulsive or poorly planned.  It was chillingly conceived over multiple months and has its roots in a mindset defendant embraced from a young age.  Indeed, a defendant motivated by radical Islamic ideology is less amenable to deterrence than an individual who is not. (*See* Bruce Hoffman, *Inside Terrorism* 127-28 (2005), "Traditional counterterrorism approaches and policies may not be relevant, much less effective, in the face of religious terrorism. . . . given both the religious terrorists' fundamentally alienated worldviews and their often extreme, resolutely uncompromising demands."). "[T]errorists[,] [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011), citing *United States v. Meskini,* 319 F.3d 88, 92 (2d Cir.2003).

Defense counsel has stated that, on medication, the defendant appears to be more mature and focused. But they have not said that he has renounced violence. A more mature and focused defendant may be a more mature and focused jihadist. Moreover, defendant, to this day, has failed to accept responsibility for his actions, instead attempting to place the blame for his conduct on the government. The defendant has never stated that he would not attempt to kill again nor has he demonstrated any remorse of his conduct. To the contrary, the defendant has demonstrated multiple times that he is violent, and continues to pose a serious and real danger to the public. Nothing that has occurred since his last attempted murder, including any medication he is currently taking, indicates that his violent tendencies or desires have diminished.

A significant sentence is also needed to deter others from committing similar acts of planned violence. There is no question that citizens have a right to express and hold unpopular views, or views that are contrary to those of their government. Our democratic system encourages just such dissent. What cannot be tolerated, however, is the individual who allows his personal views to consume him to such an extent that he believes that violence is an acceptable means of making his point. For the other people in this country who may disagree with the policies of the United States, the sentence imposed should be lengthy enough to deter others from using violent means to express their views.

### E. The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants

Section 3553(a)(6) requires that, in imposing sentence, a court should seek to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." An examination of cases in which defendants have engaged in comparable conducts suggest that an elevated term of imprisonment is warranted.

### 1. The Cactus bombing

In cases where young men have attempted to detonate weapons of mass destruction under similar circumstances, district courts have imposed sentences ranging from 23 years to 40 years. In several of the cases, the defense argued that the defendant suffered from a mental health disorder and/or the government pressured the defendant. Unlike Daoud, many of these defendants pled guilty. These sentences should be viewed as no less than a starting point here as not only did the defendant engage in similar conduct, his conduct exceeded other defendants through his attempt to kill the UC and another human being. The combined conduct of all three cases places the defendant as a greater danger than any of the individuals in the cases cited below. As such, his sentence should be, at a minimum, at the high end of the range of their sentences.

*United States v. Hassoun*, 1:10-CR-00773 (N.D. Ill. 2010, Gettleman, J., presiding) involved a 22-year-old defendant , who attempted to detonate a backpack bomb (that unbeknownst to him was inert) that he had deposited in a trash can outside of a sports bar located in the vicinity of Wrigley Field. Similar to the defense

here, the defense attempted to depict Hassoun as a uniquely gullible youth sucked into a terrorist plot during an alcohol-addled stretch of his life by an informant eager to please his FBI handlers. Hassoun pled guilty and was sentenced to 23 years.

Derrick Shareef was sentenced to 35 years' imprisonment after pleading guilty to attempted use of weapons of mass destruction. Shareef, 22, was befriended by a law enforcement cooperating source with whom he discussed his violent ideas and plan of attack for months. Like Daoud, Shareef conducted surveillance of the targeted location. Shareef was arrested after he attempted to purchase from a UCE a handgun and four grenades (that unbeknownst to him were inert) that he intended to detonate at a local shopping center. *United States v. Shareef*, 2011 WOL 183876, (N.D. Ill. May 13, 2011, Coar, J., presiding).

In *United States v. Mohamud*, 843 F.3d 420 (9th Cir. 2016), the defendant, 19, was convicted after a trial of attempting to detonate a car bomb during a crowded Christmas tree lighting ceremony in Portland, Oregon. The car bomb was inert and was provided to Mohamud by undercover FBI agents. At sentencing, the district court acknowledged that, although the jury had rejected the entrapment defense, the undercover FBI agents "imperfect[ly] entrapped Mohamud through their frequent praise and religious references, especially considering his youth. But the 'horrific' nature of the intended crime, which would have resulted in a great deal of death and mutilation, still warranted a sentence of thirty years' imprisonment." *Id*. at 431-432.

The sentence imposed by the district court in *United States v. Smadi*, 3:09-CR-00294-M (N.D. Tex. Oct. 28, 2010) also provides guidance. Smadi was 19 with a

history of schizophrenia and abuse as a child, who attempted to detonate a truck bomb (that was provided to him by an undercover FBI agent and unbeknownst to him was inert) at an office building with the intent to inflict economic and commercial damage on the United States. Smadi pled guilty to the attempted use of a weapon of mass destruction and was sentenced to 24 years' imprisonment.

In *United States v. Osmakac*, 868 F.3d 937 (11th Cir. 2017), the defendant, following a trial, was convicted of attempting to detonate an (unbeknownst to him) inert car bomb provided to him by an undercover FBI agent. The undercover agents gave Osmakac, who took steps to engage in the transaction, multiple chances to say no the transactions, but he never did, even after multiple warnings. "Both the CS and [UC] warned Osmakac of the ramifications of an attack involving weapons of mass destruction, and they repeatedly told Osmakac not to move forward with his plan if he was not prepared." *Id*. at 960. Like Daoud, Osmakac rejected the opportunities to back out. At trial the jury rejected the defense's argument that Osmakac was entrapped by the FBI and that his mental condition rendered him more susceptible to manipulation by government agents and informants. *Id*. at 949. Osmakac was sentenced to 40 years' imprisonment.

In *United States v. Khalifi*, 1:12-CR-00037-JCC (E.D. Va. 2012) the defendant, 28, attempted to conduct a suicide attack on the U.S. Capitol using a suicide bomb vest and automatic weapon (that unbeknownst to him were inert), was sentenced to 30 years' imprisonment after waiving indictment and pleading guilty.

51

*United States v. Finton*, 3:10-CR-30215-DRH (S.D. Ill. 2010), the defendant, a 29-year-old convicted felon with a history of bipolar personality disorder, who attempted to detonate a truck bomb (that unbeknownst to him was inert) at a federal building and expressed concerns about targeting civilians, was sentenced to 28 years' imprisonment after pleading guilty.

*United States v. Nafis*, 1:12-CR-00720 (E.D.N.Y. 2012), the defendant, 21, attempted to detonate a truck bomb (that unbeknownst to him was inert) at the Federal Reserve Bank of New York for the express purpose of causing economic damage, was sentenced to 30 years' imprisonment after pleading guilty.

*United States v. Martinez*, 1:10-CR-00798-JFM (D. Md. 2010), the defendant, 21, who attempted to detonate a truck bomb (that unbeknownst to him was inert) at a military recruiting center and expressly stated that he did not want to kill civilians, was sentenced to 25 years' imprisonment after pleading guilty pursuant to a plea agreement.

Although defendant did not construct the bomb that he sought to detonate, his intent was to kill as many men and women as he could. Although he never trained at a terrorist training camp, he subscribed to the same violent ideology and maintained a similar commitment to murder. Indeed, defendant remained steadfast in his desire to kill despite the OCEs and UC's attempts to discourage him from committing the attack. While the FBI did assist in providing him with the means to effectuate the attack that he planned, that fact alone does not substantially diminish

defendant's culpability because it was ultimately his choice to detonate the bomb—which he eagerly attempted to do.

### 2.    Soliciting the murder of the UC

In addition to the similar cases to the defendant's planned terrorist attack, defendants who have attempted to kill law enforcement personnel also have received substantial sentences.

In *United States v. Caira*, 737 F.3d 455 (7th Cir. 2013), the defendant had been indicted on felony drug charges, solicited a third person to kill the Assistant United States Attorney and the investigating DEA agent. The person who had been recruited by an intermediary contacted law enforcement and agreed to cooperate. The jury rejected Caira's claim that the plot was all the idea of the intermediary, which he pointed to "cajoling text messages" sent by the intermediary as proof. The defendant was sentenced to life plus twenty years.

In *United States v. Dick*, 194 F.3d 1314 (6th Cir. 1999), the defendant, while in prison on a drug offense, told his cellmate that he planned to escape from prison and kill several people who had testified against him, including an FBI agent. When the defendant realized he was not going to be able to escape, he recruited someone else to do the killing. His cellmate notified the FBI and cooperated. The defendant was convicted of, among other counts, 18 U.S.C. § 1114. The defendant was sentenced to 35 years' imprisonment.

In *United State v. Crosby*, 139 F.3d 893 (4th Cir. 1998), the defendant, while incarcerated on a drug offense, solicited other inmates to kill his probation officer, whom he blamed for his supervised release revocation. A cellmate notified law

enforcement and cooperated with the government. The defendant was sentenced to a total term of 30 years' imprisonment.

### 3. Stabbing of cellmate

Not surprisingly, a defendant who attempted to kill another inmate in prison, similar to the defendant, received a serious term of imprisonment.

In *United States v. Gustin*, 642 F.3d 573 (7th Cir. 2011), the defendant, an inmate in a federal prison, was convicted of attempted murder of another inmate, in violation of 18 U.S.C. § 113(a)(1) and was sentenced to life imprisonment.

The common thread that runs through the defendant's offenses is violence committed on behalf of his twisted and violent religious beliefs. Each successive crime committed by the defendant shows how committed he is to acting on his belief in violent jihad. A sentence of not less than 40 years is necessary to avoid unwarranted sentence disparities even with defendants who have committed only one of the three crimes that defendant has.

## III.  CONCLUSION

The government requests that the Court sentence defendant to a term of 40 years' imprisonment and a lifetime term of supervised release.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:  /s/ *Barry Jonas*
BARRY JONAS
TIFFANY ARDAM
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300